LAKE LBJ MUNICIPAL UTILITY DISTRICT, Appellant,

v.

Bennett COULSON & C.A.E. Inc., Appellees.

Bennett COULSON, Appellant,

v.

LAKE LBJ MUNICIPAL UTILITY DISTRICT, Appellee.

Nos. 14130, 14131.

Court of Appeals of Texas, Austin.

May 8, 1985.

Rehearing Denied June 26, 1985.

See also Tex., 678 S.W.2d. 943.

J. Ron Young, Randall D. Wilkins, Rowe & Young, Houston, for Lake LBJ Municipal Utility Dist.

C. Charles Dippell, Sears & Burns, Houston, for Bennett Coulson & C.A.E., Inc.

Before POWERS, EARL W. SMITH and CARROLL, JJ.

POWERS, Justice.

Bennett Coulson and C.A.E., Inc. recovered judgment against the Lake LBJ Municipal Utility District in a suit for sums allegedly due them under a written contract to furnish the District various kinds of engineering services. The judgment rests upon the jury's answers to special issues. We will sustain the District's first point of error on appeal, reverse the judgment below, and remand the cause for a new trial.

The interests of Coulson and C.A.E., Inc. being identical on appeal, we shall refer to them collectively as the "Engineer."

The Engineer declared on the contract, alleging that before his discharge by the district he had fully performed his obligations thereunder with respect to preparing certain plans and specifications, thereby becoming entitled under the contract to the sums specified as his compensation for such work.[1] Denying generally the Engi-

---

1. The contract between the District and the Engineer recites that it was made October 29, 1971.

 A. *Recital.* The District "confirms and ratifies" its previous employment of the Engineer, reciting that he had theretofore "represented the District in all engineering matters to date ..."

 B. *Employment of the Engineer and the General Nature of His Work.* The District, by the contract, also employs the Engineer "to handle all future engineering matters during the life of this contract, with particular reference to" a $15,000,000 improvement program contemplated by the District. The improvement program referred to consists in the following: (a) a water supply, storage and distribution system; (b) a sewage collection and treatment system; (c) a drainage system; (d) a water-plant site; and (e) a sewage-plant site. The attendant construction cost is estimated to be $10,700,000. The cost of attendant services is estimated to be $4,300,000, consisting of such expenses as legal advice, the marketing of bonds, "investigation, plans and Engineer's work," interest, "operation of District during construction," fees for a fiscal agent and bond attorney, and unspecified "Contingencies."

 C. *Particulars of the Work to be Done by the Engineer and His Compensation.*

 1. *Services rendered or to be rendered in connection with the creation of the District.* "[P]rofessional engineering and associated services necessary pertaining [sic] to the creation of the District": Twelve categories of services are here listed. The first ten appear to refer to work pertaining to the creation and organization of the District as a political subdivision. The Engineer was required to perform this work unless he had already done so before the making of the contract on October 29, 1971. The last two categories appear to refer to continuing matters extending *after* "the creation of the District," notwithstanding the contrary implication of the heading under which they are included: They are described as follows:

 Engineering assistance in setting up policies and charges on house connections, meter contracts and deposits and new plumbing inspection.

 Engineering operational advice on all District water and sewage facilities during the life of the contract.

 As to this aspect of the Engineer's work, that is, his work in connection with the "creation of the District," the contract provides for his compensation in the following terms:

 [He] shall receive 1% of the total authorized bond issue voted by the District for the financing of the Projects. Payment of this portion shall be payable out of the first issuance of bonds or from any other legal source.

 2. *Services rendered in connection with the construction projects constituting the improve-*

*ment program.* This category of work, required of the Engineer, is described in the following terms:

[The Engineer] shall also render, if he has not already done so, any or all of the professional engineering and associated construction services necessary in the planning, financing, designing, construction layout and general supervision of the Projects.

D. *Further Provisions as to Compensation and Its Payment.* The balance of the contract, literally interpreted, provides merely for measuring, fixing and payment of the Engineer's compensation for his work on the construction projects. After the sentence quoted immediately above, the contract instrument continues as follows:

For this work the [Engineer] shall be compensated in accordance with the Texas Society of Professional Engineers "Manual of Profession Practice for General Engineering Service" dated 1963, based on a percentage of the construction cost as detailed under Section V [of the manual], a copy of which is attached hereto and marked "Exhibit B." The fee for plans and specifications shall be determined by applying each individual project cost to Chapter [sic] V, Classification A [of the manual], in order to arrive at a percentage figure in the following manner, to-wit:

Three numbered paragraphs follow, each referring separately to one of the three projects to be built by the district, i.e., the water system, the sewage system, and the storm-sewer system. In identical terms, the three paragraphs provide for measuring the Engineer's compensation in connection with the particular system and in reference to the manual:

The construction cost of the [particular] system shall be computed, and the [Engineer] shall be paid basic minimum fee for plans and specifications of the [particular] system as specified in the [manual], as detailed under Section V, Classification A, Page 8 [of the manual], a copy of which is attached hereto and marked "Exhibit B."

The portion of the manual referred to in the three paragraphs contains a "Schedule of Charges" in which the Engineer's compensation is fixed at a percentage of the "Cost of Construction." The percentage to be applied to the "Cost of Construction" is derived from one of two divisions ("Classification A" or "Classification B") listing ranges of percentages. For example, where the "Cost of Construction" exceeds $10,000,000, the applicable and maximum percentage range specified in "Classification A" ranges from 5% to 5.50%. "Cost of Construction" being thus a determinant of the Engineer's compensation, the contracting parties agreed as follows:

The cost of construction shall include the total value of construction contracts, the cost of all materials and equipment purchased or obtained by the District for corporation into the Projects, and the cost of all construction, pur-

chase of plant sites, rights of way, contributions to other agencies for mutual cooperative projects, and construction financing on the Projects undertaken by the District itself. The cost of construction for application on [sic] fee percentage shall be based upon the total competitive bid cost. If competitive bids are not obtained, then the [Engineer's] estimate of reasonable competitive construction bid prices shall be used to determine the construction cost and the applicable percentage fee.

Continuing, the contract purports to set forth "[p]rovisions for payment to the" Engineer. As will be observed, however, some of these provisions expressly govern *other* substantive rights and obligations of the parties. We shall emphasize these provisions.

Provisions for payment to the [Engineer] shall be as follows:

1. When the plans and specifications are complete and presented to the Board of Directors, the [Engineer] shall be paid his entire fee from such individual services rendered in the preparation of the plans and specifications thereof as hereinabove specified. Payment shall be from the issuance of bonds or any other legal source.

2. The [Engineer] shall be paid at the rate of ¼% of the estimated cost of construction in connection with work performed for the District for utility bond projection work and/or for engineering projection expenses and bond maturity schedule. Payment for this work shall be made upon completion by the [Engineer] ... when presented to the Board of Directors. Payment shall be from the issuance of bonds or from any other legal source.

3. The [Engineer] will perform the construction layout for drainage and utility improvements and make Inspection of this construction work for an additional fee as specified in the [manual at] Page 11, Item "D"(2). Payment for this work shall be made on completion by the [Engineer] on any Individual Project or part of any Individual Project, and payment shall be made from the issuance of bonds or from any other legal source.

4. In the event the [Engineer] at the request of the District performs any additional work or furnishes any services not hereinabove specified, the [Engineer] shall charge the District for such additional work and services, and the District shall compensate the [Engineer] at the rate recommended in the [manual].

5. *The District herein ratifies and approves all services and work heretofore performed by the [Engineer] in connection with Projects for the District, and the District hereby instructs the [Engineer] to proceed with the plans and specifications which will be required for the construction of all water, storm and sanitary sewage systems and appurtenances thereto in the District.* [emphasis supplied]

neer's allegations, the District alleged that the plans and specifications supplied by him were not "final plans," were not prepared in a "good and workmanlike manner," and did "not meet the standards of reasonable engineering practice," all of which amounted to a "total or partial failure of consideration."[2]

The District's first point of error complains in various ways of the trial court's submission of special issue one. The issue, answered affirmatively by the jury, reads as follows:

Do you find from a preponderance of the evidence that during the time in question [the Engineer] furnished [the District] with sufficient plans and specifications for construction of a water system, a sanitary sewer system and drainage *for the needs of such District, and to secure approvals from appropriate governmental agencies, under the circumstances then existing?*

(Emphasis supplied). In answer to special issue two, the jury found that before his discharge the Engineer was "ready, able and willing to perform" the balance of his contract obligations. From the jury's answers to these special issues, the damages awarded the Engineer in the judgment were calculated as a matter of law.

The District contends in various ways that the form of special issue one was misleading, that it constituted a comment on the weight of the evidence by the reference to governmental approval, and that the issue omits to submit the "controlling" or ultimate question of whether the Engi-

---

6. *In event the District employs a consulting engineer other than [the Engineer] for the purpose of appraising utility improvements which the District proposes to purchase, [the Engineer] shall furnish [the appraising engineer certain kinds of documents] and shall consult with said appraising engineer in behalf of the District.* [emphasis supplied] For this service the Engineer shall be paid 1% of the purchase price of the utility appraised.

7. Because the [Engineer] must execute certain engineering phases of the work hereunder long in advance of the actual construction stage and because of other considerations, the District agrees that if any action should be taken, the practical effect of which would render unmarketable the District's authorized but unissued bonds, or if the District or any part thereof should be annexed by or incorporated into any city or political subdivision of the State, that total part of the fee pertaining to engineering services shall become due and payable to the [Engineer] immediately upon public notice being given of official intention of such act or acts and shall be paid in full not later than ten (10) days prior to the final aforementioned act or acts....

8. *The [Engineer] shall prepare plans and specifications for the District and secure approval by the Texas State Department of Health, Bureau of Sanitary Engineering.* [emphasis supplied] If any of said work completed by the [Engineer], or if any work hereafter designed by the [Engineer] at the request of the District shall be abandoned or suspended in whole or in part, the [Engineer] shall be paid by the District for services rendered in connection therewith either the fees specified in Paragraphs 1 through 3 inclusive under "Provisions for Payment" of this contract or on the basis of cost plus 100%, the method of compensation to be at the option of the [Engineer]. For the purpose of this agreement, a Project shall be regarded as abandoned or suspended in whole or in part when the Board of Directors is so advised by the [Engineer] in writing.

9. *This contract will terminate when the [Engineer] has performed all of the services required for the construction of the Projects and all construction work in connection with the Projects has been completed.* [emphasis supplied]

10. The [Engineer] will be reimbursed for any expenses, including staff time, incurred as a result of attending meetings in the District.

Concluding, the contract instrument recites its due execution by authorized individuals whose signatures are there set forth.

2. As indicated hereafter, the primary dispute between the parties is whether the plans and specifications, tendered by the Engineer as full performance of his contract, were *deficient* when measured against a standard supplied by operation of law in the absence of a standard expressed in the contract. A material deficiency in the plans and specification "operates as the non-occurrence of a condition." Restatement (Second) of Contracts § 237, comment *a.* The effect of the non-occurrence may be to discharge any duty owed by the other contracting party—here the District's duty to pay the sums promised by it in the contract. *Id.* The District's reference to "failure of consideration" has nothing to do with an absence of consideration; the less-confusing term used in the Restatement is "failure of performance." *Id.*

neer's plans were done "in a good and workmanlike manner" or "in accordance with appropriate standards or engineering practice." The evidence adduced at trial would support a finding either way on the issue of whether the Engineer's plans and specifications were sufficient to meet either standard of skill and diligence suggested by the District.

The Engineer rejoins with several contentions that we shall summarize: (1) special issue one is correctly framed because the parties' contract imposed an *express* covenant that the plans and specifications would be sufficient to meet the approval of a governmental agency, and this *express* covenant on the subject precludes the incorporation of any *implied* covenant such as those suggested by the District; (2) it being undisputed that the plans and specifications were approved by the governmental agency, and the parties having made such approval the only applicable standard for measuring the Engineer's performance, any judicial determination of the alleged defective performance is foreclosed; (3) incorporating in special issue one an implied standard of performance, such as the "good and workmanlike" standard, would improperly have placed upon the Engineer a burden to disprove what is an affirmative defense or an essential element of the District's counterclaim for negligence; (4) and such an implied standard would have confused the issue, amounted to a mere shade or phase of a controlling issue, and would have constituted a double submission because the implied standard was, in effect, submitted by the trial court in special issue six, presenting the District's counterclaim for negligence.

In rather lengthy briefs, the parties make various other contentions revolving around special issue one and other points of error, but we believe the foregoing discussion fairly summarizes their respective positions and presents the issues determinative of the appeal.

The contract is set forth at length in a footnote.[3] It is abundantly clear that the instrument contains no provision whatever that purports *explicitly* to specify any standard by which to measure whether any plans and specifications supplied by the Engineer are or are not sufficient to constitute performance of his contract obligation. Indeed, the instrument contains no express standard of performance in regard to any of the Engineer's *other* obligations, such as construction supervision and various kinds of consultative services which he promised in the contract to perform for the District. The Engineer would differ with our conclusion, at least in regard to the plans and specifications he promised to supply for the purpose of constructing the water, sewage, and drainage systems referred to in special issue one. But the absence of any express provision purporting to state an agreed standard applicable to all or the generality of the Engineer's work under the contract suggests a limited scope and effect to the contract provision he relies upon as constituting an express standard of performance applicable to his plans and specifications for the water, sewage and drainage systems. And the phrasing and context of the express provision relied upon suggest only a limited scope and effect intended by the parties, as we shall now see.

The Engineer relies upon section eight of the payment provisions of his contract with the District.[4] That section provides in part that the Engineer:

> shall prepare plans and specifications for the District and secure approval by the Texas State Department of Health, Bureau of Sanitary Engineering. . . .

Based upon this provision alone, the Engineer argues the familiar rule that an implied obligation may not be permitted to destroy the effect of an express obligation stated in the contract. Stated otherwise, he argues that the implied general standard suggested by the District may not be engrafted upon the contract in the face of this narrower express provision.

---

**3.** See n. 1, *supra.*

**4.** See n. 1, *supra.*

We observe, however, that the implied standard is not inconsistent with the express standard and our interpretation of the foregoing contract provision will not in any event permit the effect suggested by the Engineer. Moreover, the Engineer's argument is illogical for it too depends upon the incorporation by *implication* of a standard of contract performance, if we understand correctly his contention. He contends that the regulations of the governmental agency in question contain a requirement that the plans and specifications submitted to it may not be approved unless in accord with good engineering practices. But the contract provision quoted above does not *expressly* incorporate this or any other standard as a measure of the Engineer's performance under the contract. That may be done only by way of a *deduction* from the terms of the contract provision—an *implication* that the standard sufficient for agency approval shall also be the agreed standard for performance under the contract. We reject the interpretation which this implication requires.

In the first place, the Engineer's implication is not, in our view, one so clearly within the understanding of the parties that they deemed it unnecessary to express, and therefore omitted to do so; nor is it an implication necessary to effectuate the purpose of their contract *as a whole*. *Danciger Oil & Refining Co. of Texas v. Powell*, 137 Tex. 484, 154 S.W.2d 632 (Tex. 1941). It is unreasonable to suppose that the parties intended *no* standard of performance whatever by which to measure the Engineer's reciprocal right to compensation under the contract. It is also unreasonable to suppose that they intended an express standard in regard to the plans and specifications while leaving all other duties required of the Engineer under the contract to be measured by an implied standard. We refer to such other duties as his consultant work in the creation of the District; his assistance in "setting up policies and charges on house connections, meter contracts and deposits and new plumbing inspections"; the furnishing of "engineering operational advice on all District water

and sewage facilities during the life of the contract," that is, during the period following governmental approval; and his work in supervising the construction of the water, sewage, and drainage systems. The very terms and tenor of the provision relied upon by the Engineer do not suggest an intention that even deficient plans and specifications will be compensable if approved by the governmental agency. On the other hand, the terms of the provision literally, reasonably, and naturally suggest two duties imposed upon the Engineer: (1) he "shall prepare plans and specifications for the District"; and (2) he shall "secure approval by the State Department of Health, Bureau of Sanitary Engineering," without which approval the water and sewage systems could not be built. Tex.Rev. Civ.Stat.Ann. art. 4477–1, § 12 (1976 & Supp.1985). (It is not clear from the statute that drainage systems require such official approval. If not, then the logic of the Engineer's argument is seriously eroded, of course, for the express standard suggested by him would not apply to that important part of his plans and specifications, raising a serious doubt that the parties had the intent attributed to them *post hoc* by the Engineer.)

In the second place, we are bound by the interpretative principles which controlled the decision in *Black v. Acers*, 178 S.W.2d 152 (Tex.Civ.App.1943, writ ref'd). There, the builder of a dwelling contended that approval of the Federal Housing Administration satisfied his contract obligations to the owner as expressed in the plans and specifications by which he agreed to build the house. Indeed, the contract provided that the house was to be built "to meet the requirements of the Federal Housing Administration...." The builder argued that this and similar provisions evidenced an intention of the parties to designate the agency's approval as determinative in the matter of whether the builder's work met the plans and specifications of the contract, the agency's decision being binding in the absence of fraud or bad faith. The court rejected the argument,

first on the ground that the effect contended for by the builder must be expressly stated and may not be implied because the right to a judicial determination of contract performance may not be contracted away by implication. As in the present case, the meaning to be assigned the relevant contract provision really depended wholly upon implication. The court also rejected the builder's argument on the additional ground that the contract provision, properly interpreted, was intended to be only a provision for *minimum* standards. *See also Delhi Pipeline Corporation v. Lewis, Inc.*, 408 S.W.2d 295 (Tex.1966) (contract may provide for performance satisfactory to a third party, but the provision "is operative only where it appears from express terms of the contract or from plain language therein that it was the intention of the parties that the determination of the [third party] shall be final and conclusive; and such a provision is not to be implied"). In the present appeal, the Engineer's contentions are rejected by these decisions, for nothing in the contract expressly or in plain words would make the approval of the governmental agency tantamount to a determination that the plans and specifications were sufficient to constitute contract performance, notwithstanding whatever *administrative* effect such approval might have for agency purposes.

Even though the Engineer's implication be rejected, there remains the issue of *what* standard or test should be implied to measure the sufficiency of the Engineer's plans and specifications, there being no express provision in that regard. Such a standard or test is, of course, essential to the contract as a whole for upon it depends the question of whether or not the Engineer discharged his contractual duty to the District, thereby becoming entitled to the reciprocal sums required of the District under the contract—the sums for which he sued in the present case.

 There is no dispute in the present case about whether the agreement set forth in the footnote amounts to a

"contract," that is, a legally binding and enforceable agreement.[5] In our view, the contract contains no express provision against which one may test whether the Engineer's plans and specifications amount to performance of that part of his contract duties relating to the plans and specifications. In such circumstances courts may, and to effectuate the admitted contract must, supply a term which is reasonable in the circumstances. Restatement (Second) of Contracts, *supra*, § 204. This is often done by "interpretation," and chiefly by "implication." But these words may obscure the fact that the court is really supplying an omitted term necessary to effectuate the purposes of the contract in circumstances where, for a variety of reasons, the parties failed to make express provision about an event that did occur to affect their rights and obligations. *Id.* comments *a—d. See generally* Farnsworth, *Disputes Over Omission in Contracts*, 68 Columbia L.Rev. 860 (1968).

 It is well-settled, of course, that courts do, in such cases, supply the missing terms that are essential to determining the rights and duties of the parties under the contract they have made. The term supplied must be a "reasonable" one in the circumstances, a requirement founded upon an assumption that the contracting parties were reasonable men. It is on this ground that courts routinely supply a reasonable time for performance when no time is specified in the contract, *Moore v. Dilworth*, 179 S.W.2d 940 (Tex.1944); a reasonable duration for a contract when none is specified, *Hall v. Hall*, 308 S.W.2d 12 (Tex. 1957); or a reasonable price for goods and services when none is specified in the contract, *Bendalin v. Delgado*, 406 S.W.2d 897 (Tex.1966). And on precisely the same ground, courts will supply a reasonable standard of workmanship when work is contracted to be done, but no level of skill or diligence is specified in the contract. The standard of reasonableness may be reflected in general terms. *Davidson v.*

---

**5.** The Engineer sued solely on the contract and not in quantum meruit.

*Edgar,* 5 Tex. 492 (1851) (sufficient "to answer the object desired"). In cases of professional work, such as that contracted for here, the standard is implicit in statements such as the following:

> In contracting for his services, an architect implies that he possesses skill and ability, and that he will exercise and apply his skill and ability reasonably and without neglect. The skill and diligence which he is bound to exercise are such as are ordinarily required of architects, and his duty depends on the particular agreement entered into with his employer.

*Cobb v. Thomas,* 565 S.W.2d 281, 286 (Tex. Civ.App.1978, writ ref'd n.r.e.). Similar expressions are found in other decisions. *See, e.g., Ryan v. Morgan Spear Associates, Inc.,* 546 S.W.2d 678 (Tex.Civ.App. 1977, writ ref'd n.r.e.); *Capitol Hotel Co. v. Rittenberry,* 41 S.W.2d 697 (Tex.Civ. App.1931, writ dism'd). The idea of a reasonable standard of skill and diligence is also implicit in the "good and workmanlike" standard advocated by the District in this appeal. *See Westbrook v. Watts,* 268 S.W.2d 694 (Tex.Civ.App.1954, writ ref'd n.r.e.); *New Trends, Inc. v. Stafford-Lowdon Co.,* 537 S.W.2d 778 (Tex.Civ.App.1976, writ ref'd n.r.e.).

▮▮▮ We hold the trial court committed reversible error in refusing to incorporate—by instruction, definition, or in the terms of special issue one—a reasonable standard of skill and diligence, so that the jury could have determined from a preponderance of the evidence whether the plans and specifications supplied by the Engineer met that standard and thus established his right to recover on his contract. Indeed, the initial vice in the court's charge is that it incorporates no ultimate and proper contract-based standard at all. As framed, the issue incorporates only two standards: the "needs" of the District in the matter of water, sewage, and drainage systems; and "approvals from appropriate governmental agencies...." *Neither* of these constitutes an ultimate issue under the contract. For example, the plans and specifications may have been sufficient to meet the minimum undefined "needs" of the district, but nevertheless insufficient to meet a reasonable level of professional workmanship. The same may be said, of course, of the factor of governmental approval. Thus, judgment for the Engineer *on the contract* may not rest upon the jury's answer to special issue one, which is the purported effect of the trial-court judgment.

▮▮▮ Moreover, it was pleaded that the Engineer's plans and specifications were *not* "good and workmanlike" and not "in accordance with appropriate standards of engineering practice"; and, evidence was adduced to that effect. Whether the Engineer's work met the standard of reasonably good work, made a requirement of the contract by operation of law, was thus *disputed.* The burden therefore arose, in the Engineer and as a part of his action on the contract, to obtain a jury finding that his plans and specifications met the contractual requirement of reasonableness; or stated differently, that they complied with the skill and diligence ordinarily required of engineers.

▮▮▮ It is fundamental that a plaintiff, in order to recover on his contract, must himself plead and prove not only the terms of his contract, but that he has performed the work required of him therein as consideration for the sum promised by the defendant. *Dalton v. George B. Hatley Co., Inc.,* 634 S.W.2d 374, 376 (Tex.App. 1982, no writ); *Casanova v. Falstaff Beer, Inc.,* 304 S.W.2d 207 (Tex.Civ.App.1957, writ ref'd n.r.e.); 3A Corbin on Contracts § 749 (1960). There is no *presumption* that the plaintiff's promised work was done *or that it was done as the contract required,* at least where these are disputed issues. Any material defect in his performance will defeat his right to recover on the contract and the defendant has no legal obligation to pay any reciprocal dependent sums until it be established by the plaintiff that his work was done as the contract required. *See e.g., Kelly v. Webb,* 27 Tex. 368 (1864); *Gulf Pipe Line Co. v. Nearen,* 135 Tex. 50, 138 S.W.2d 1065 (Tex.1940); *Jessen v. Le Van,* 161 S.W.2d 585 (Tex.Civ.

App.1942, no writ); *Howard v. Sears*, 196 S.W.2d 105 (Tex.Civ.App.1946, writ ref'd n.r.e.).

In the present case, the implied provision for reasonable skill and diligence was as much a part of the Engineer's contract as any express provision contained therein, such as his obligation to supply the plans and specifications in issue. Having declared on that contract, containing provisions which must be performed before the contract imposes liability upon the District to pay for the work, the Engineer "cannot recover without alleging and proving that the provisions have been complied with...." *City of Fort Worth v. Rosedale Park Apartments, Inc.*, 276 S.W.2d 395, 397 (Tex.Civ.App.1955, writ ref'd). It has not been established in the present case, from a preponderance of the evidence, that the Engineer's work was of the quality demanded by his contract as a condition of the District's obligation to pay the promised sums. We hold, therefore, that the Engineer is not entitled to judgment against the District for those sums. We deem it necessary, however, to address several of the other contentions raised by the Engineer.

One should not infer from the foregoing that the trial court was obliged to submit two special issues, one inquiring whether the plans and specifications *were* prepared in a good and workmanlike manner (an issue upon which the Engineer had the burden of proof to establish what is an essential element of his action to recover on the contract) and another inquiring whether the plans and specifications *were not* prepared in a good and workmanlike manner (an issue upon which the District had the burden of proof to establish this essential element of its counterclaim for negligence).[6] The possibility of conflicting answers is obvious. It is also obvious that the two propositions are mutually exclusive and one or the other necessarily exists. In such cases, Tex.R.Civ.P.Ann. 277 (1985) au-

thorizes the trial court to submit disjunctively the existence of the two mutually exclusive propositions. While we find no decision directly in point, a disjunctive submission might take the form of the following example:

Do you find from a preponderance of the evidence that the plans and specifications were or were not prepared in a good and workmanlike manner?

Answer: "They were" or "They were not."

*See generally* Hodges, Special Issue Submission in Texas § 32 (1959); Bourland, *Disjunctive Submission of Inferential Rebuttal Issues*, 33 Baylor L.Rev. 147 (1981). In the present case, whether the plans were prepared in a good and workmanlike manner constitutes simultaneously an essential element of each party's cause of action against the other. The conflicting pleadings and evidence on this point incidentally raise an inferential-rebuttal issue which the proponent of each action must disprove as part of his cause of action. But, of course, Rule 277 now prohibits the former practice of an independent submission of an inferential-rebuttal issue. In the form of special issue suggested above, it appears to us that conflicting answers are avoided and each of the mutually exclusive findings would be determinable from a preponderance of the evidence, thus permitting a fair adjudication of both the contract action and the counter-claim, depending upon the jury's answer to the single issue.

But did not the jury's negative answer to special issue six necessarily determine the essential element of the Engineer's cause of action—that is, that his plans and specifications were prepared in a good and workmanlike manner? Special issue six inquired:

Do you find from a preponderance of the evidence that during the time in question [the Engineer] was negligent in failing, if it did, to furnish adequate plans and specifications to obtain reasonable com-

---

**6.** For purposes of discussion only, we shall utilize the "good and workmanlike" standard suggested by the District without intending thereby to preclude the use in a new trial of any other reasonable standard of performance.

petitive bid prices for the construction work....

Answer: "Yes" or "No."

The trial court's instructions defined "negligence" as a failure to use the ordinary care of a prudent registered engineer engaged in similar work; and, defined, "ordinary care" in similar terms. The jury answered "No" to the proposition posed by special issue six.

The wording of the issue erroneously placed upon the District the burden to disprove an essential element of the Engineer's cause of action because no similar burden was elsewhere placed upon the Engineer. The effect of the charge as a whole was to create a presumption that the Engineer's work was good and workmanlike. For example, the "No" answer returned by the jury was not required, by the framing of the issue, to rest upon a preponderance of the evidence. Only a "Yes" answer would rest thereon, under the phrasing utilized. Thus, the jury's "No" answer constitutes only a failure to find negligence by a preponderance of the evidence, and indicates only that the District failed to meet its burden of proof on its counterclaim for negligence. The "No" answer *does not establish* the converse proposition that, from a preponderance of the evidence, the Engineer's work was found to have met the standard of quality which the law imputed to the contract in the absence of an express provision in that regard. *Beam v. Voss*, 568 S.W.2d 413 (Tex.Civ. App.1978, no writ).

We therefore hold the trial court erred in refusing over the District's objection [7] to submit to the jury an essential element of the Engineer's cause of action on the contract; that is, that his plans and specifications met the performance standard applicable to the case. Being an essential element of his action on the contract, the sufficiency of his plans and specifications were, as the District contends, an ultimate or "controlling" issue upon which

depended the Engineer's right to recover on the contract. We hold as well that special issue one, as framed, was indeed misleading for the reason that it inquired whether the plans and specifications were sufficient for the needs of the district and the approval of governmental agencies, neither of which constituted the correct ultimate issue under the contract, but only minimum, subsidiary, and evidentiary matters. The judgment for the Engineer rests upon the jury's answer to this issue. For these reasons, we reverse the judgment below and remand the cause for a new trial.

cussed in the initial part of this opinion.

---

7. The District's objections to the charge were precise and ample to preserve the error dis-