

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00082-CV
_____

REBA JAYNETTE FUSSELL HOLLIS, Appellant

V.

ROBERT HOLLIS AND WIFE, SHERRY HOLLIS, Appellees

On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. 38,214

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

This is a trespass-to-try-title case in which Robert Hollis entered into an oral agreement to purchase 304.84 acres of land (the Ranch) from Robert's father, Wayford Hollis. Several years after Wayford's death,[1] his widow, Reba Hollis, informed Robert that she was going to sell the Ranch. In response, Robert and his wife, Sherry Hollis, filed this suit and asserted their fee-simple ownership of the Ranch based on the oral agreement and adverse possession. After a jury trial, the jury entered a verdict and found that (1) Robert and Wayford entered into an oral agreement for Robert to purchase the Ranch, (2) Robert and Sherry completed performance of the agreement, (2) Reba was bound by the agreement, and (3) Robert and Sherry completed all actions necessary to adversely possess the Ranch under the ten-year and twenty-five-year statutes of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.026–.027. The trial court entered an additional finding that Reba failed to comply with the oral agreement. Based on the jury's verdict, the trial court entered judgment confirming and quieting title to the Ranch in Robert and Sherry.

On appeal, Reba asserts that the trial court erred because (1) Robert and Sherry did not affirmatively plead estoppel as a basis that Reba was bound by the oral agreement, (2) the jury questions on adverse possession should have been conditioned upon a negative response to the issue asking if an oral agreement existed, (3) the evidence was legally and factually insufficient to support the jury's estoppel findings, (4) it submitted a defective partial performance question,

---

[1]Wayford passed away in November 2005. In his will, Wayford bequeathed the Ranch to Robert.

2

and (5) it improperly limited Reba's inquiry during voir dire. We will affirm the trial court's judgment.

## I.    Background

Robert testified that he had owned cattle since he was a young boy and bought his first Red Brangus in 1971. By the time he graduated from college, Robert had between fifty-one and fifty-four certified Red Brangus, and he wanted to be a cattle rancher. Robert and Wayford began looking for property, and Robert's uncle, Dan Hollis, showed them the Ranch.

According to Robert, he could not purchase the Ranch, so he and Wayford entered into an oral agreement. Under the agreement, Wayford would purchase the Ranch, and Robert would bring his cattle to the Ranch, manage the cattle operations, conduct cattle sales, and repay Wayford with all of the proceeds from cattle sales. Under the agreement, when the property lien note was paid off, Robert would become owner of a one-half interest in the Ranch, and Robert would receive the other one-half interest upon Wayford's death. Sherry testified that Robert told her of the agreement in 1981, the first year of their marriage. It was undisputed that Robert and Wayford were also in a fifty-fifty partnership for the cattle operations.[2]

The Ranch was purchased in Wayford's and Reba's names in 1978. Robert brought fifty-four cattle to the Ranch in 1978, and he moved into an old house on the Ranch in 1980 after he graduated from college. In 1981, he married Sherry, and they moved into a trailer on the Ranch shortly before their second child was born. When the herd grew to several hundred head, he

---

[2]Robert and Wayford also submitted an affidavit to the Titus-Camp-Franklin-Morris County FSA (Farm Service Agency) Committee that affirmed that they were fifty-fifty partners in the Ranch.

rented additional pasture space. Over several years, Robert improved the quality of the grass on the Ranch to make it more productive.

Most of the cattle were sold at Hollis Family Production Sales, which, for the most part, took place in a large barn facility that was built on the Ranch by Robert and laborers hired for that purpose. Wayford and Reba paid for the materials and some of the labor to build the barn. Robert testified that some money from smaller cattle sales went into the Ranch's business account to pay expenses, but the money from the larger cattle sales went to Wayford. Even after the property lien note was paid in full, Wayford continued to receive all of the money from the production sales. Based on Wayford's financial records, Robert testified that Wayford received cattle income from 1978 through 2000 in the amount of $823,672.47. Wayford paid Robert a small salary, which from 1981 through 1999 totaled $185,784.85. According to Robert, when he and Wayford dissolved their cattle partnership around 2000, Wayford received the cattle located in Louisiana, and Robert received the cattle on the Ranch and assumed $180,000.00 in notes related to the Ranch's operation.

The lien on the property was released on January 8, 1993. The next year, Robert and Sherry began building a new house on the Ranch. The evidence showed that they spent $45,000.00 building the house. According to Robert, if it were not for the agreement and Reba's knowledge of the same, he would not have built the house on the Ranch. Reba knew before they broke ground that they were building the house. Nevertheless, she did not object to them building the house, did not tell them to stop, and did not claim that they were building it on her property. Rather, Reba helped hang wallpaper in the house. Robert has also replaced the fence

4

around the Ranch twice since Wayford's death, at a cost of $33,456.00, and built a pool to provide water for the cattle. Nevertheless, Robert acknowledged that, at some point after the house was built, Reba told him to survey off an area for the house, and they would deed it to him.

Wayford passed away in November 2005. In his last will and testament, Wayford bequeathed to Robert "all of the farm property and all improvements thereon situated and belonging, located in Titus County, Texas."[3] Robert testified that, by including this language in the will, his father kept his word regarding the oral agreement. When Wayford's will was read, Robert told Reba and his sisters that he had owned one-half of the Ranch since the note was paid off and that he owned all of it as a result of the agreement with his father. Robert claimed that everybody was already aware of this.

After Wayford's death, Reba tried to sell the Ranch two times. The first time, Reba claimed that she just wanted to know the value of the property and that she did not intend to sell it. Nevertheless, Reba executed a Farm and Ranch Real Estate Listing Agreement that listed the Ranch for sale in March 2013. The second time, in March 2015, she called Robert to let him know beforehand. She told Robert that she would give him something for the house, but she was going to sell the land and use the money as needed. As a result, Robert and Sherry filed this lawsuit.

Reba testified that she and Wayford were close, that they discussed everything, and that they made the major decisions regarding family and property together. She denied that there was

---

[3]Wayford's last will and testament was executed in August 2005, about three months before his death.

5

ever an oral agreement between Robert and Wayford or that she had ever heard anything about it. Rather, she testified that she and Wayford purchased the Ranch because they did not have a retirement program. She also testified that she and Wayford found the Ranch and decided to purchase it and that Robert was not involved in the conversation. She also testified about the renovation that she and Wayford made to the old house that was on the Ranch.

Reba maintained that Wayford purchased the Red Brangus cattle to put on the Ranch and that he approached Robert in 1983 or 1984 to manage the cattle because Robert had two children and no job. She denied that Robert brought any cattle with him to the Ranch. Rather, she maintained that Wayford sold him sixteen head of cattle in 1983 and that he would give him a head of cattle now and then for working on the Ranch. She also denied that money from the cattle sales paid the note on the Ranch.

She testified that she and Wayford removed their cattle from the Ranch in 1999, that they planned to sell the Ranch, except for the amount Robert needed for his family, and that Wayford was diagnosed with cancer in August 2005. Before he passed away three months later, Wayford had his will prepared, but according to Reba, he did not say anything about an agreement with Robert about the Ranch.

Both Reba and Robert's sister, Lisa Herbert, testified that Robert never mentioned the agreement when they met with an attorney after Wayford's death. Lisa also testified that she had talked to Robert at a Memorial Day celebration after their father's death about Reba needing to sell some of the Ranch. Although Robert said he did not want to sell the Ranch because it was

6

how he made his living and he wanted to leave it to his children, he did not say anything about an agreement with their father to buy it.

At the conclusion of the evidence, the jury found, inter alia, that:

1. Wayford and Robert "enter[ed] into an oral agreement" in which Robert "agreed to devote his time, toil, effort, and expense to operate" the Ranch and "to pay [Wayford] all the proceeds from the sale of the cattle until the note on the [Ranch] was paid," and Wayford agreed to "convey one-half of the [Ranch] to Robert" "when the note was paid," and to "convey the remaining one-half interest in the [Ranch] to [Robert] in his will";

2. Robert and Sherry "completed performance of the oral agreement" by paying the consideration as agreed in number one above, taking possession of the Ranch and "making permanent and valuable improvements on the [Ranch] with [Wayford]'s consent";

3. Reba was "bound by the oral agreement" because her "name was on the deed to the [Ranch]," she "was aware of the oral agreement at the time the agreement was being performed," and she "was aware of the improvements [Robert and Sherry] made to the property at the time the improvements were made";

4. Reba "receive[d] and accept[ed] the proceeds from the sale of cattle with full knowledge or notice of the facts and rights involved in the oral agreement";

5. Wayford "fully compl[ied] with the oral agreement";

6. Robert and Sherry "held peaceable and adverse possession of the [Ranch] for a period of [ten] years after January 1, 1980, but prior to March 23, 2015, by cultivating, using, or enjoying the [Ranch]";

7. Robert and Sherry "committed acts after January 8, 1993, which unmistakably assert[ed] a claim of exclusive ownership of the [Ranch]";

8. In 1994, Reba had notice of Robert's and Sherry's "acts which unmistakably assert[ed] a claim of exclusive ownership of the [Ranch]"; and

9. Robert and Sherry "complet[ed] performance of the oral agreement" in 1993.

7

The jury also awarded Reba $9,000.00 for her counterclaim for payment of taxes on the Ranch and found against Reba on her remaining counterclaims. In addition, on Robert and Sherry's motion, the trial court entered an additional finding that Reba failed to comply with the oral agreement. *See* TEX. R. CIV. P. 279 ("[T]he trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment."). The trial court subsequently entered its judgment based on the jury's verdict and its additional finding and ordered (1) that Robert and Sherry "recover fee simple title to and possession of" the Ranch, (2) that title to the Ranch be quieted in them "to the exclusion of any and all other rights, claims, or interests of any third parties," (3) that Reba recover "$9,000.00 for taxes paid on the [Ranch],"[4] and (4) that she "take nothing on her [other] counterclaims."

## II.    Unchallenged Findings

Initially, we note that Reba has not challenged the sufficiency of the evidence supporting several of the jury's findings, which affect our disposition of some of her issues on appeal. When an appellant fails to challenge the sufficiency of the evidence supporting a jury's findings, she, like this Court, is bound by the jury's unchallenged findings. *Aviation Off. of Am., Inc. v. Alexander & Alexander of Tex., Inc.*, 751 S.W.2d 179, 179–80 (Tex. 1988) (per curiam); *see Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 488 n.2 (Tex. 2014).

On appeal, Reba did not challenge the sufficiency of the evidence supporting the jury's findings (1) that Robert and Sherry have had peaceable and adverse possession of the Ranch for

---

[4]Robert and Sherry filed a cross-appeal, conditioned upon this Court's reversal of the judgment in their favor, and asked that the award to Reba also be reversed.

a period of ten years after January 1, 1980, but before March 23, 2015, by cultivating, using, or enjoying the Ranch;[5] (2) that they committed acts after January 8, 1993, that unmistakably asserted a claim of exclusive ownership of the Ranch; and (3) that Reba had notice of Robert's and Sherry's acts that unmistakably asserted a claim of exclusive ownership of the Ranch in 1994 (the Adverse-Possession Findings). As a result, unless Reba has asserted some other reversible error related to these findings, both Reba and this Court are bound by them.

## III. The Unconditional Submission of the Adverse-Possession Questions

In her second issue, Reba asserts that the trial court erred when it failed to condition the jury questions regarding adverse possession on a negative response to jury question number one[6]

---

[5]To answer this question, the jury was instructed, inter alia, "A person claiming title to property by adverse possession must show that the possession is not only actual, but also visible, continuous, notorious, distinct, hostile and of such a character as to indicate unmistakably an assertion of a claim of exclusive ownership of the occupant."

[6]Jury question number one asked:

> Question No. 1: Did Wayford Hollis and Robert Hollis enter into an oral agreement whereby:
>
> l) Wayford Hollis agreed to purchase the property,
> 2) Robert Hollis agreed to devote his time, toil, effort, and expense to operate a ranch on the property,
> 3) Robert Hollis agreed to pay Wayford Hollis all the proceeds from the sale of cattle until the note on the property was paid,
> 4) Wayford Hollis agreed that when the note was paid, he would convey one-half of the property to Robert, and
> 5) That upon his death, Wayford Hollis would convey the remaining one-half interest in the property to Robert Hollis in his will.
>
> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.
>
> In this question, "the property" means the real property identified in Plaintiffs' Exhibit 5.
>
> Answer "yes" or "no."
>
> Answer: _yes

9

regarding the existence of an oral agreement. Reba argues that, since Robert and Sherry's claim to title was based on the oral agreement with Wayford or, alternatively, on adverse possession, the existence of an oral agreement would mean that their possession of the Ranch was permissive and, therefore, not adverse to Wayford and Reba. Because, she argues, these were mutually exclusive theories, the theories should have been submitted disjunctively, with the adverse-possession questions conditioned upon a negative answer to the oral-agreement question. We disagree.

## A.      Standard of Review

In its jury charge, the trial court is required to "submit the questions, instructions and definitions . . . , which are raised by the written pleading and the evidence." TEX. R. CIV. P. 278. "A trial court has considerable discretion to determine proper jury instructions, and we review a trial court's decision to submit or refuse a particular instruction for an abuse of discretion." *Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018) (citing *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012)). "One way in which a trial court may abuse its discretion is by failing to follow guiding rules and principles." *Id.* (citing *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)). We will reverse "only if a review of the record reveals the error was harmful." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 728 (Tex. 2016) (citing TEX. R. APP. P. 44.1).

## B.      Disjunctive Submission

The Texas Rules of Civil Procedure permit the disjunctive submission of a question "when it is apparent from the evidence that one or the other of the conditions or facts inquired

10

about necessarily exists." TEX. R. CIV. P. 277. "A disjunctive submission has been described as 'an "either/or" question posed in a manner that necessarily prevents the two factual alternatives inquired about from being found to exist concurrently.'" *Turner v. Precision Surgical, L.L.C.*, 274 S.W.3d 245, 250 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (quoting R. Mike Borland, Comment, *Disjunctive Submission of Inferential Rebuttal Issues*, 33 BAYLOR L. REV. 147, 148 (Winter 1981)). Thus, "rule 277 allows the trial court to submit, disjunctively, the existence of two mutually exclusive propositions when conflicting answers are possible." *Id.* (citing *Lake LBJ Mun. Util. Dist. v. Coulson*, 692 S.W.2d 897, 908 (Tex. App.—Austin 1985), *rev'd on other grounds*, 734 S.W.2d 649 (Tex. 1987)). But the submission of a disjunctive question has been held improper when "[t]he alternatives presented were not true opposites; they were not factually inconsistent; they were not mutually exclusive; and one of the . . . alternatives . . . did not necessarily exist." *Rathmell v. Morrison*, 732 S.W.2d 6, 12 (Tex. App.—Houston [14th Dist.] 1987, no writ).

One of our sister courts of appeals has also noted,

Certain commentators have opined that "[d]isjunctive submissions . . . should be used sparingly and with great caution" because they

run the danger of either misplacing the burden of proof (when one of two options must be shown by a preponderance of the evidence and the other need not be) or of unduly limiting the jury's choices (when the jury in fact has more than two choices—*e.g.,* the plaintiff was negligent, the defendant was negligent, or the negligence of neither party was shown by a preponderance of the evidence).

*Turner*, 274 S.W.3d at 250 (quoting 5 THE HONORABLE JOE BROWN, ET AL., TEXAS PRACTICE GUIDE: PERSONAL INJURY § 13:115 (2nd ed. 2008) (citing Borland, Comment, *Disjunctive*

11

*Submission of Inferential Rebuttal Issues*, 33 BAYLOR L. REV. at 148 ("stating that disjunctive submission 'is appropriate only when one or the other of the conditions or facts *must* exist; its use would be inappropriate where there is the possibility of an alternative finding not presented in the issue'"))).

### C.     Analysis

In her argument, Reba focuses only on jury question one, regarding the existence of an oral agreement between Wayford and Robert, and jury questions six through nine, regarding adverse possession. She argues that the existence of an oral agreement "would have precluded adverse possession as the legal theory because Robert and Sherry's possession of Hollis Ranch would have been permissive and, therefore, not adverse." Consequently, she concludes, Robert and Sherry's oral agreement theory and adverse possession theory of recovery "are mutually exclusive."

In support of this argument, Reba cites *Martinez v. Galvan*, No. 04-09-00497-CV, 2010 WL 2679984 (Tex. App.—San Antonio Jul. 7, 2010, no pet.) (mem. op.), and *Bustamante v. Gutierrez Flores*, 770 S.W.2d 934, 937 (Tex. App.—San Antonio 1989, no writ). While both of those cases support the proposition that a claimant's *entry* onto land pursuant to an oral contract is permissive and, without more, is not adverse to the record owner, neither of them preclude the possibility that the claimant's possession of the land may later become adverse to the record owner.

The San Antonio court of appeals in *Martinez*, relying on *Bustamante,* noted that, when an adverse claimant enters property under an oral contract with the owner and "*without asserting*

12

*a claim at the outset*, the claimant's possession of the land is not commenced under a claim of right inconsistent with and hostile to the claim of the owner within the meaning of the ten year adverse possession statute." *Martinez*, 2010 WL 2679984, at *2 (emphasis added) (citing *Bustamante*, 770 S.W.2d at 937). However, the court then explained how the permissive entry under an oral contract may become adverse to the record owner:

> [I]n order for the adverse claimant to prevail against the record owner, the adverse claimant must prove: (1) a repudiation of the owner's title and commencement of the assertion of an open and notorious claim to the land; (2) with notice thereof clearly brought home to the owner, either actually or constructively; and (3) with the further proof that there had been adverse possession of the land for the necessary limitation period subsequent to the time of notice.

*Id.* (citing *Bustamante*, 770 S.W.2d at 937). Therefore, a claimant's permissive entry onto land, such as under an oral agreement, does not preclude the claimant's possession from becoming adverse to the record owner at a later date.

As a result, the existence of an oral agreement was not factually inconsistent with, or mutually exclusive of, Robert and Sherry's adverse possession theory of recovery. An examination of the record and the jury charge makes this clear. It was undisputed at trial that the oral agreement was between Wayford and Robert, and this was set forth in jury question one. It was also undisputed that Wayford and Reba purchased the Ranch during their marriage and that the Ranch was their community property. As a result, in order to recover Reba's community property interest in the Ranch under the oral agreement, Robert and Sherry had to establish that Reba was bound by the oral agreement. This was a major issue at trial, and Robert and Sherry

13

sought findings that Reba was bound by the oral agreement under two theories, as reflected in jury questions three[7] and four.[8]

Under the jury charge, the jury could have answered question one affirmatively and found that there was an oral agreement between Wayford and Robert and also answered questions three and four in the negative and found that Reba was not bound by the oral agreement. In that scenario, Robert and Sherry could not recover Reba's community interest in the Ranch under their oral agreement theory, even though the jury found that there was an oral agreement. Nevertheless, they would have been entitled to have the jury consider their alternate adverse possession theory of recovery. *See Turner*, 274 S.W.3d at 249 ("[A] party is entitled to

---

[7]Jury question number three stated:

Question No. 3: ls Reba Hollis bound by the oral agreement?

You are instructed that Reba Hollis is bound by the oral agreement if you find by a preponderance of the evidence that:

(1)    Reba Hollis' name was on the deed to the property,
(2)    Reba Hollis was aware of the oral agreement at the time the agreement was being performed, and
(3)    Reba Hollis was aware of the improvements Robert and Sherry Hollis made to the property at the time the improvements were made.

In this question, "the property" means the real property identified in Plaintiffs' Exhibit 5.

Answer "yes" or "no."

Answer: _____

[8]Jury question number four stated:

Question No. 4: Did Reba Hollis receive and accept the proceeds from the sale of cattle with full knowledge or notice of the facts and rights involved in the oral agreement?

Answer "yes" or "no."

Answer: _____

14

an affirmative submission of all of its theories of recovery that have support in the pleadings and evidence." (citing TEX. R. CIV. P. 278; *Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex. 1992) (per curiam))). As a result, it would have been improper for the trial court to submit the adverse-possession questions conditioned upon a negative answer to the oral-agreement question, as requested by Reba. *See Rathmell*, 732 S.W.2d at 12.

Therefore, we find that the trial court did not abuse its discretion when it did not condition the jury questions regarding adverse possession on a negative response to the oral-agreement question. We overrule Reba's second issue.

## IV. Effect of the Adverse-Possession Findings

In her first issue, Reba asserts that the trial court erred in submitting jury questions three and four because Robert and Sherry did not affirmatively plead estoppel as a basis to bind Reba to Wayford's oral agreement with Robert. In her third issue, Reba contends that there was legally and factually insufficient evidence to support the jury's affirmative answers to jury issues three and four. Reba's fourth issue asserts that the trial court erred when it refused to submit her requested partial-performance question. Each of these issues challenge Robert and Sherry's oral agreement ground of recovery. In their response on appeal, Robert and Sherry argue that because Reba has not successfully challenged the Adverse-Possession Findings, any error complained about in these issues was harmless.[9] We agree.

"On appeal, the appellant must challenge all independent grounds supporting the judgment." *Curtis v. Urbina*, No. 06-19-00028-CV, 2019 WL 4124632, at *3 (Tex. App.—

---

[9]In her reply, Reba only argues that the adverse-possession theory does not support the judgment because of the alleged error asserted in her second issue, which we have overruled.

15

Texarkana Aug. 30, 2019, pet. denied) (mem. op.) (quoting *Shirley v. Butcher*, No. 06-16-00089-CV, 2017 WL 1538164, at \*3 (Tex. App.—Texarkana Apr. 27, 2017, pet. denied) (mem. op.)). If the unchallenged independent ground supports the trial court's judgment, "we must accept the validity of that unchallenged independent ground, and thus any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment." *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 763 (Tex. App.—Texarkana 2017, pet. dism'd) (quoting *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 424 (Tex. App.—Dallas 2009, no pet.)); *see* TEX. R. APP. P. 44.1(a)(1) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment . . . .").

The Adverse-Possession Findings established each of the elements[10] set forth in *Martinez* and *Bustamante*, which would entitle Robert and Sherry to recovery under their adverse-possession theory. *See Martinez*, 2010 WL 2679984, at \*2; *Bustamante*, 770 S.W.2d at 937. Because these unchallenged findings establish an independent ground of recovery that supports the trial court's judgment, we find that any error in submitting jury questions three and four, any

---

[10]To the extent that the Adverse-Possession Findings omitted an element of this ground of recovery, we presume that it was "found by the [trial] court in such manner as to support the judgment." TEX. R. CIV. P. 279. This is because, under Rule 279,

> [w]hen some but not all of a cluster of issues necessary to sustain an independent ground of recovery or defense are given and answered by the jury without objection or request, the trial court may make written findings on omitted issues raised by the evidence. If no written findings are made, the omitted issues are deemed to have been found by the court in such manner as to support the judgment.

*Harmes v. Arklatex Corp.*, 615 S.W.2d 177, 179 (Tex. 1981) (quoting *Strauss v. LaMark*, 366 S.W.2d 555, 557 (Tex. 1963)).

16

insufficiency of the evidence supporting the jury's findings under those jury questions, or the trial court's refusal to submit Reba's partial performance jury question was harmless.[11] *Hartwell*, 528 S.W.3d at 763. We overrule Reba's first, third, and fourth issues.

## V. Limitation of Voir Dire

Reba also asserts that the trial court improperly limited her inquiry during voir dire. She argues that the trial court erred when it forbade her inquiry as to Sherry's brother, Ricky Baker, who was a prominent businessman in the community. She contends that she was thereby restricted in her ability to identify biases and prejudices and to intelligently exercise her peremptory strikes.

### A. Standard of Review

"Litigants have the right to question potential jurors to discover biases and to properly use peremptory challenges." *In re Commitment of Wiley*, No. 06-18-00056-CV, 2019 WL 490142, at *2 (Tex. App.—Texarkana Feb. 8, 2019, no pet.) (mem. op.) (quoting *In re Commitment of Hill*, 334 S.W.3d 226, 228 (Tex. 2011) (per curiam)). As a result, "trial courts should allow 'broad latitude' to counsel 'to discover any bias or prejudice by the potential jurors so that peremptory challenges may be intelligently exercised.'" *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 749 (Tex. 2006) (quoting *Babcock v. Nw. Mem'l Hosp.*, 767 S.W.2d 705, 709 (Tex. 1989)). However, "[c]ounsel's latitude in voir dire, while broad, is constrained by reasonable trial court control." *Id.* at 750 (citing *Cortez ex rel. Est. of Puentes v. HCCI-San*

[11]Because Reba has not challenged the sufficiency of the evidence supporting the Adverse-Possession Findings, we need not address her arguments in support of her first, third, and fourth issues. *See Petroleum Solutions, Inc.*, 454 S.W.3d at 488 n.2 (when an appellant fails to challenge the sufficiency of evidence supporting the jury's findings on an independent ground supporting the trial court's judgment, an appellate court need not address an issue challenging the sufficiency of evidence supporting the jury's findings on other grounds of recovery).

*Antonio, Inc.*, 159 S.W.3d 87, 92 (Tex. 2005)). A trial court's "refusal[] to allow lines of questioning during voir dire are reviewed under an abuse of discretion standard." *In re Commitment of Hill*, 334 S.W.3d at 229 (citing *Vasquez*, 189 S.W.3d at 753–54). "[A] court abuses its discretion when its denial of the right to ask a proper question prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges." *Id.* (quoting *Babcock*, 767 S.W.2d at 709). A trial court does not abuse its discretion by refusing to allow counsel to voir dire on matters not relevant to the proceeding. *Sw. Elec. Power Co. v. Martin*, 844 S.W.2d 229, 238 (Tex. App.—Texarkana 1992, writ denied). "To obtain a reversal, an appellant must show that the trial court abused its discretion and that the error was calculated to cause and probably did cause the rendition of an improper judgment." *McCoy v. Wal-Mart Stores, Inc.*, 59 S.W.3d 793, 797 (Tex. App.—Texarkana 2001, no pet.) (citing TEX. R. APP. P. 44.1; *Babcock*, 767 S.W.2d at 709).

### B.    Background

Prior to trial, Robert and Sherry filed a motion in limine and sought to restrict "[a]ny mention or reference of Ricky Baker . . . , or that Ricky Baker . . . is the brother of [Sherry]." Baker is the former owner of a trailer manufacturer near Mt. Pleasant and a prominent person in the community. At the hearing on the motion, the trial court granted the motion after it determined that Baker would not be a witness at trial. Nevertheless, the trial court clarified its ruling in the following exchange:

> THE COURT:  . . . I'm going to grant this motion in limine, but if it becomes apparent during voir dire that this needs to be brought up for some reason or during the course of trial, then you all can approach and we'll take it up at that time.

18

[COUNSEL FOR ROBERT AND SHERRY]: And your Honor, it may develop if someone -- if [Reba's attorney] asks does anyone know Sherry Hollis and the jury says yep, I don't know her but I know her brother, Ricky Baker, well, that may pop out and --

THE COURT: Absolutely. And once that pops out, then it's fair game. Then y'all can approach, and once that comes out, if Mr. Baker's name is mentioned by a juror, not by the attorney, then we'll revisit that, because that may then open it up.

        . . . .

THE COURT: . . . . But again, if a juror mentions it, then I expect y'all to approach immediately, and then we'll take that up. If a juror doesn't mention it, then I don't expect Mr. Baker's name to be used.

Then, before voir dire, Reba sought further clarification of the trial court's order:

[COUNSEL FOR REBA]: Yes, your Honor.

        . . . .

I'm bringing this up before the voir dire starts. It's regarding motions in limine.

The first is paragraph eight in plaintiff's first motion in limine. Agree to approach the bench before anything is said or done with regard to that issue. Paragraph eight precludes me as representative of Mrs. Hollis from asking the panel if anyone here knows Ricky Baker, the brother of Sherry Hollis.

And is it the Court's ruling that I cannot do that?

THE COURT: I believe that was the Court's ruling. I believe it was stated that no one intended to call Mr. Baker as a witness. Therefore, there was no reason -- no relevancy in asking the panel if they know Ricky Baker.

Reba objected and argued that, because Baker was a "prominent person" who had "great business and political influence" in the county, it was unlikely that there was any adult in the county who did not know of him and that many knew him personally. She also argued that the

19

denial of her ability to inquire of such knowledge and follow up deprived her of her right to a fair and impartial jury. In response, Robert and Sherry pointed out that, under the trial court's ruling, Reba could inquire whether the veniremembers knew Robert and Sherry or any of their family members, and if any said they knew her brother, Baker, then it was out and in the open. Then this exchange followed:

> THE COURT: So you have no objection to [Reba] asking in voir dire if anyone knows any family members --
>
> [COUNSEL FOR ROBERT AND SHERRY]: Correct.
>
> THE COURT: -- of Mrs. Hollis or Mr. Hollis.
>
> [COUNSEL FOR ROBERT AND SHERRY]: I believe that's very fair, and it would be unfair of me to ask different. And if it comes out at that point, well, we can deal with it, but I don't think he needs to ask it to interject it to inform people they're brother and sister where they might not know that they're brother and sister.
>
> [COUNSEL FOR REBA]: Well, your Honor, I disagree. I feel like I have a right to advise the panel that Ricky Baker is the brother of Sherry Hollis and I ask that I have the right to ask who knows him and the nature and extent of that knowledge. And then, of course, if you felt like the law and evidence on the issue was in favor of Mrs. Hollis, would your knowledge of Mr. Baker as a very influential person make -- your personal knowledge make it difficult to decide in favor of the defendant.
>
> That's a logical question. That's a common question that's asked in voir dire examination. And that's my position.
>
> THE COURT: [Addressing Counsel for Reba] . . . I understand your position. I stand by the ruling on the motion in limine Number 8. Your objection is overruled. I do not believe that there is any benefit for you specifically asking the jury if they know Ricky Baker is the brother of Mrs. Hollis.

> If you ask if they know any of the family and anyone says that they know that Ricky Baker is the brother, then that opens it up. But I think that's as far as we need to go on that one.

During her voir dire examination, Reba asked whether any of the veniremembers knew Robert or Sherry. Although several indicated they knew either Robert or Sherry, or both, Reba did not inquire whether any of them knew any of Sherry's family members. Also, several veniremembers stated they had worked at the trailer manufacturing facility, and one veniremember indicated that he lived next to it, but none of them indicated they knew Baker. Only two other veniremembers said they knew Baker and his wife, and one said she went to school with their children. Reba did not inquire whether those veniremembers knew any of Baker's family members.

### C. Analysis

Generally, parties are allowed a wide latitude in voir dire in order to uncover any bias or prejudice held by the potential jurors. *Vasquez*, 189 S.W.3d at 749. For example, in *In re Hill*, counsel was entitled to question potential jurors whether they would be able to give a fair trial to a person they thought was a homosexual, when the defendant's sexual history was relevant to the State's proof in the case. *In re Commitment of Hill*, 334 S.W.3d at 228–29. However, this latitude is subject to the trial court's authority to exercise reasonable control over the court proceedings. *Vasquez*, 189 S.W.3d at 750. For example, in *Martin*, the trial court did not err in refusing to allow the defense counsel to voir dire the jury regarding a specific lawsuit that was not relevant to the action. *Martin*, 844 S.W.2d at 237–38. Likewise, a trial court properly exercised its control when it refused to allow a party to interject potentially prejudicial facts that

21

were neither known to the jury nor relevant to any issue in the case. *See Gulf States Utils. Co. v. Reed*, 659 S.W.2d 849, 855–56 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e).

At the motion in limine hearing and before voir dire, it was undisputed that Baker was an influential person in the community and that, if a juror knew that he was Sherry's brother, there was a possibility that the juror may be biased either for the benefit of Sherry or to her detriment. It was also undisputed that Baker would not be a witness at trial. Nevertheless, Reba sought to first inform the veniremembers that Baker was Sherry's brother, then inquire whether any veniremember knew Baker and how his relationship to Sherry would affect her ability to give Reba a fair trial.

In its ruling, the trial court attempted to balance Reba's right to discover the bias or prejudice of any juror who already knew both Baker and that he was Sherry's brother against the potential prejudicial effect of informing the entire venire panel that Sherry was the sister of a wealthy and influential member of the community. The court's solution was to forbid Reba from disclosing that Baker was Sherry's brother but to allow her to inquire whether the veniremembers knew Sherry or her family and to inquire further as to the prejudice or bias held by any veniremember that indicated she knew that Baker was Sherry's brother.

Reba argues that the trial court's ruling "wholly foreclosed an entire line of questioning." However, the trial court's ruling provided Reba with an avenue to determine whether any veniremember knew Baker and knew that he was Sherry's brother. Nevertheless, Reba did not ask those veniremembers who disclosed that they knew Sherry, if they also knew any of her family members. She also did not ask those veniremembers who knew Baker whether they also

22

knew his family members.[12]  As a result, any deficiencies in the trial court's ruling remain unknown.

Further, if she was not satisfied with the trial court's solution, "it was incumbent on [Reba] to request alternative approaches to avoid the problems the trial court was addressing by its ruling." *Vasquez*, 189 S.W.3d at 759.  Because she did not "propos[e] a different method of inquiry that would avoid [the problems addressed by the trial court], the breadth of the trial court's ruling is untested." *Id.*  As a result, we are unable to determine "whether the trial court would have allowed other sorts of inquiries had counsel presented their substance." *Id.* at 760.

On this record, we find that the trial court did not abuse its discretion in limiting Reba's voir dire inquiry.  We overrule this issue.

## VI.    Disposition

For the reasons stated, we affirm the trial court's judgment.[13]

Jeff Rambin
Justice

Date Submitted:        January 24, 2024
Date Decided:          February 6, 2024

---

[12]Reba points out that, when the trial court considered motions to strike for cause after voir dire, she asked to inquire further of veniremember 48, who had indicated she knew Baker, but that the trial court denied the request. However, veniremember 48 was then struck for cause on Reba's unopposed motion.  As a result, Reba was not harmed by the trial court's denial.

[13]Because we affirm the trial court's judgment, we need not address Robert and Sherry's conditional cross-appeal.